**BRUNER v. OSWALD et al.**

No. 8654—Opinion Filed Jan. 28, 1919.

(178 Pac. 693.)

(Syllabus.)

**1. Appeal and Error—Equitable Action—Weight of Evidence—Review.**

On appeal from a decree in an action of an equitable nature, on a question of the weight of the evidence, the Supreme Court will not weigh the evidence and remand the case unless it is clearly shown that the trial court failed to consider uncontroverted evidence, or that the findings and decree are clearly against the weight of the evidence.

**2. Indians—Allotment—Inheritance.**

Under section 6 of the Supplemental Creek Agreement, providing that only Creeks, or their descendants, male and female, shall inherit the allotment of a deceased Creek, held, that B., enrolled as a Seminole freedman, and who claims to be the father of S., enrolled as a Creek freedman, is excluded from any interest in the Creek allotment of S., who died March 23, 1902, at the age of 18 months, the final rolls being conclusive as to Creek citizenship.

Error from District Court, Creek County; Ernest B. Hughes, Judge.

Action by Robert Bruner against A. Oswald and others. Trial by agreement before the court without a jury, findings and judgment for defendants, motion for new trial denied, and plaintiff brings error. Affirmed.

Warren & Crutcher, for plaintiff in error.

James B. Diggs, Rush Greenslade, William C. Liedtke, and Embry, Crockett & Johnson, for defendant in error A. Oswald.

Miller & Dean and J. L. Skinner, for other defendants in error.

PITCHFORD, J. Robert Bruner, plaintiff

in error, commenced this action in the district court of Creek county against the defendants, for the purpose of quieting title to certain lands. The land in question was the allotment of Susie Grayson, an enrolled Creek freedman. Susie Grayson was born September 1, 1900 and died March 23, 1902. The allotment was made in her name to her heirs on July 9, 1906. Susie Grayson was the daughter of Alice Grayson, an enrolled Creek freedman, who died on March 16, 1901. The defendants deraigned title through conveyances from the heirs of Alice Grayson; that is, the heirs of Susie Grayson on her maternal side. The plaintiff is an enrolled Seminole freedman, and claims to have been the lawful husband of Alice Grayson and the father of Susie Grayson, and, therefore, under the Arkansas law, found in chapter 49 of Mansfield's Digest. as modified by the provision to section 6 of the Supplemental Creek Treaty (Act June 30, 1902, c. 1323, 32 Stat. 501), is entitled to inherit an undivided one half interest in the allotment of his deceased child.

The defendants' contention is that Robert Bruner was not the lawful husband of Alice Grayson, and that Susie was her illegitimate child, and therefore plaintiff could not inherit. Defendants further contend that, regardless of the illegitimacy of the allottee, Susie Grayson, her putative father, Robert Bruner, could not inherit from her, because he was not a Creek citizen. or a descendant of a Creek citizen, and further, that the plaintiff, never having been in possession of the land, could not maintain an action solely to quiet title thereto.

When the case came on for trial on the 14th day of April, A. D. 1916, the plaintiff, Robert Bruner, and the defendants, by their respective attorneys, expressly agreed to waive a jury trial, and agreed to try the cause to the court, and, the parties having announced ready for trial, said cause was heard by the court. The court, having heard the evidence offered and introduced by the respective parties, found, among others, the following facts: (1) That the real estate in controversy was the allotment of one Susie Grayson, enrolled as a citizen of the Creek Tribe of Indians; that she was born September 1, 1900, died March 23, 1902. (2) That said Susie Grayson was the illegitimate daughter of one Alice Grayson, having been born out of wedlock; that said Alice Grayson died on March 16, 1901, and left surviving her no husband and no child or descendant, except the said Susie Grayson; and the said Alice Grayson never married; that the said Alice Grayson is the lawful child of Island and Sylla Grayson,

husband and wife. (3) That the plaintiff, Robert Bruner, is a duly enrolled member and citizen of the Seminole Nation, enrolled opposite No. 2011 upon the freedman roll of said nation, and was so enrolled in the month of July, A. D. 1898; that Rachel Bruner, his mother, is a duly enrolled citizen of the Seminole Nation, enrolled opposite No. 2217 upon the freedman roll thereof; that she died in the month of February, 1915; and the plaintiff's father, Benjamin Bruner, died in the year 1885 or 1886; that the plaintiff was born before the war between the states, and the plaintiff's ancestors formerly were Creek slaves. to which findings the plaintiff duly excepted. and filed his motion for a new trial, which was overruled by the court and exceptions noted.

The main points relied upon by the plaintiff to secure a reversal of the judgment in the court below are that the court erred in overruling the motion of the plaintiff in error for a new trial, and holding that the lands in question were not in possession of the plaintiff, and were in the possession of the defendants; that Robert Bruner was not capable of inheriting the lands, and the failure of the court to find specifically that the plaintiff was not the husband of Alice Grayson. Were the findings of the court justified under the evidence in the case?

We have examined the briefs prepared by counsel for plaintiff and defendants, respectively, have carefully considered the evidence, and conclude that there was ample evidence to sustain the findings of the court below. The trial court could reasonably find, under the evidence, that the plaintiff was duly enrolled as a Seminole: his mother was also enrolled as a Seminole; his father died in the Seminole country some time between 1885 and 1886; further, that the plaintiff, prior to the birth of Susie Grayson, was living with a woman by the name of Annie, who was generally known to be his wife; that he is the father of several children by Annie prior to the birth of Susie; that after the death of Alice Grayson, the mother of Susie, the plaintiff was still found living with his Seminole wife, Annie.

The plaintiff attempts to prove that prior to the birth of Susie, he left the Seminole country and lived among the Creek Tribe; that he and Alice contracted the relation of man and wife under the customs prevailing among the Creeks; that he lived with Alice for some time as his wife, and that just prior to her confinement, she went to the home of her father and mother, Island and

Sylla Grayson; that soon after she returned to the home of her father and mother, she was confined; that he and Alice never lived together after that. This contention on the part of the plaintiff is attempted to be sustained by certain witnesses. Their evidence, as would naturally be expected, being given many years after the occurrence of the event about which they testified, would, in many particulars be vague and hazy. The uncontroverted evidence shows that the plaintiff had previously been married and was the father of several children by his former wife, and in order to find that the relation of man and wife existed between the plaintiff and Alice, we would be forced to indulge a mere presumption, which, under the circumstances of this case, would be extremely violent.

We have carefully read the authorities cited by plaintiff in error relating to common-law marriages, but under the evidence we hold there was not even a common-law marriage between Robert and Alice shown to exist. Placing the most favorable construction upon the testimony of plaintiff's witnesses as to the relations between Robert and Alice, we are irresistibly drawn to the conclusion that all that is established is the fact that Robert left Annie and her children and went out for a summer's vacation, and simply poached on others' preserves. If the plaintiff indulged the pleasing thought that Alice had been his wife, and that he was the father of Susie, he was grossly lacking in either marital or parental solicitude; he failed to appreciate the claims that Alice had upon him, who, broken in health, returned to the home of her father and mother and there gave birth to Susie. It is true that one witness testifies that he went with the plaintiff to see Alice during her confinement, and that this witness testifies to the generosity of the plaintiff, in that he gave Alice at the time a dollar or such matter; at least he testifies that he was so informed by plaintiff. The plaintiff never contributed anything towards the burial of Alice or Susie, and waited almost 12 years after the death of Susie before making any claim to her estate. Another significant fact disclosed by the evidence is that the mother of Alice was never able to ascertain from her daughter who was the father of her child. So far as the evidence discloses, Alice never complained, never indicated to any one the father of Susie.

"She locked her secret in her breast,

And died in travail unconfessed."

Marriage should be more sacredly regarded than to dignify the relation which it is claimed existed between plaintiff and the deceased, Alice, by the respectable name of marriage, even considered most favorably under the testimony of the plaintiff's witnesses. The trial court correctly found that Susie Grayson was the illegitimate child of Alice Grayson, conceived and born out of wedlock. Checote v. Berryhill, 48 Okla. 696, 150 Pac. 679; Thigpen v. Risby, 39 Okla. 598, 136 Pac. 418.

Was Robert Bruner a person capable of inheriting the lands in question? In order to inherit, he must have been the husband of Alice Grayson; he must be a citizen of the Creek Nation, or within the proviso of section 6 of the Supplemental Creek Treaty. We have found that the plaintiff was not the husband of Alice Grayson; that he was a citizen of the Seminole Nation and duly enrolled; that his mother was enrolled as a Seminole. The plaintiff does not deny that he is enrolled as a Seminole, but claims that he is just as much a citizen of the Creek Tribe, because of the fact that his ancestors were Creek slaves, and calls attention to article 2 of the treaty between the United States and the Creek Indians, approved and proclaimed August 11, 1866 (14 Stat. 785) as evidence of his right to inherit these lands in the Creek country. Article 2 of said treaty reads as follows:

"The Creeks hereby covenant and agree that henceforth neither slavery nor involuntary servitude, otherwise than in the punishment of crimes, whereof the parties shall have been duly convicted in accordance with laws applicable to all members of said tribe, shall ever exist in said nation; and inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter these persons lawfully residing in said Creek country under their laws and usages, or who have been thus residing in said country, and may return within one year from the ratification of this treaty, and their descendants and such others of the same race as may be permitted by the laws of said nation to settle within the limits of the jurisdiction of the Creek Nation as citizens [thereof], shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds, and the laws of the said nation shall be equally binding upon and give equal protection to all such persons, and all others, of whatsoever race or color, who may be adopted as citizens or members of said tribe."

There is no proof that either the plaintiff or his father were at the time of the approval of this treaty lawfully residing in the Creek country, or that they returned to

the Creek country within one year after the ratification of the treaty. If they had desired to avail themselves of any rights under the treaty, it was their duty, if they were not residing in the country at the time of its ratification, to return within one year thereafter.

The citizenship as contemplated for the purpose of inheritance is to be ascertained from the Creek rolls and from no other source. Section 6 of the Supplemental Treaty between the United States and the Creek Indians, approved June 30, 1902 (32 Stat. L. 500), is as follows:

"The provisions of the act of Congress approved March 1, 1901 (31 Stat. L. 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory; Provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation; And provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in chapter 49."

We have been unable to find any decision construing the proviso of the section, supra, except the case of Wadsworth et al. v. Crump, 53 Okla. 728, 157 Pac. 713, an Oklahoma case, appealed to the United States Supreme Court, wherein section 2 of the Seminole Agreement, approved June 2, 1900 (chapter 610, 31 Stat. 250), was construed. Section 2 of the Seminole Agreement is in the following language:

"If any member of the Seminole Tribe of Indians shall die after the 31st day of December, 1899, the lands, money, and other property to which he would be entitled if living, shall descend to his heirs, who are Seminole citizens, according to the laws of descent and distribution of the state of Arkansas, and be allotted and distributed to them accordingly: Provided, that in all cases where such property would descend to the parents under said laws, the same shall first go to the mother instead of the father, and then to the brothers and sisters, and their heirs, instead of the father."

Upon appeal of this case to the Supreme Court of the United States (Campbell v. Wadsworth, 248 U. S. 169, 39 Sup. Ct. 63, 63 L. Ed. —), argued and submitted November 21, 1918, decided December 18, 1918, the opinion being delivered by Mr. Justice Clark, we take the following:

"The first paragraph of the agreement, which we have quoted, prescribes the persons whose names shall go upon the Seminole roll, and it declares that the rolls so made, when approved by the Secretary of the Interior, 'shall constitute the final rolls' of 'Seminole citizens,' and that to these 'and to no other persons' shall allotment of property be made. This definition of 'Seminole citizens' is followed in the second paragraph with the provision that the property of an intestate, such as we have in this case, shall descend to his heirs who are 'Seminole citizens.' There is nothing in the act to indicate an intention on the part of Congress or of the tribe that the words 'Seminole citizens,' as used in the second, shall have any other meaning than that specifically given to them in the first paragraph, but, on the contrary, both the natural and legal inference from their being used in such juxtaposition is that the same meaning shall be given them, and that if a different or more comprehensive meaning had been intended, it would have been expressed. But there are other cogent reasons why courts should not modify these final rolls by a liberal interpretation of this statutory provision. The rolls of the Seminole Tribe were compiled by the Commission to the Five Civilized Tribes, a quasi judicial tribunal, to which large powers were given by statute for that specific purpose, and the action of the Commission, when approved by the Secretary of the Interior, made 'final' by the statute, so conclusively settles all questions within its jurisdiction as to membership in the tribe and as to the rights of the Indians to tribal property that they are subject to attack, as the judgments of courts are, only for fraud and mistake."

Further on in the decision is this language:

"While it is true that it seems unnatural for the Indians to have preferred more distant relatives to their own children in providing for the descent and distribution of their property, yet from the terms of the act before us, and also from the provisions of the Supplemental Creek Agreement that 'only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit the lands of the Creek Nation' (Act June 30, 1902, c. 1323, 32 Stat. 500), it is clear that with the Indians the interests of the tribe were paramount to those of the family, and it was with a knowledge of the mode of life of their primitive people, better and more intimate than the courts can now command, that they determined that this paramount purpose would be best served by giving to children born of mixed marriages the tribal status of their mother."

We, therefore, hold that the plaintiff under the law could not inherit from Susie Grayson, even though he and her mother, Alice had been married; he not being a

Creek citizen, the inheritance being limited to Creek citizens, or their Creek descendants, and, in default of either, then to non-citizen heirs.

It is not necessary to pass upon the remaining questions, as the plaintiff in no event would be entitled to the relief he has sought. Therefore, finding no error, judgment of the lower court is in all things affirmed.

All the Justices concur.